1 | Kimberly A. Wright, Esq. (265899)
2 | **REVOLVE LAW GROUP LLP**
3 | 2601 Main Street, Suite 1200
Irvine, California 92614
4 | T: 833-775-4557
F: 888-711-7710
5 | E: Kimberly@revolvelawgroup.com
6 | Attorneys for Plaintiff, Jasvir Kaur Dosanjh
7 |
8 | **UNITED STATES DISTRICT COURT**
9 | **NORTHERN DISTRICT OF CALIFORNIA**
10 |

*(left vertical margin)* REVOLVE LAW GROUP LLP · 1200 Main Street, Suite 1200 · Irvine, California 92614 · (833) 775-4557

JASVIR KAUR DOSANJH, an individual,

              Plaintiff,

    vs.

ROMESH WADHWANI, an individual; HARKAMALJIT HAS DOSANJH, an individual; EYC ACQUISITION CORPORATION, a Delaware corporation; SYMPHONY TECHNOLOGY GROUP, LLC, a Delaware limited liability company; and Does 1 through 10 inclusive,

              Defendants.

Case No.:

**PLAINTIFF'S COMPLAINT FOR:**

1. FRAUDULENT INDUCEMENT
2. FRAUD BY INTENTIONAL MISREPRESENTATION
3. FRAUD BY CONCEALMENT
4. NEGLIGENT MISREPRESENTATION
5. CIVIL CONSPIRACY

**DEMAND FOR JURY TRIAL**

    Plaintiff  Jasvir Kaur Dosanjh, an individual, by and through her counsel of record, brings this Complaint and alleges upon knowledge about her own actions, and upon information and belief to all other matters, against Defendants Romesh Wadhwani, an individual, Harkamaljit Has Dosanjh, an individual, EYC

Acquisition Corporation, a Delaware corporation, Symphony Technology Group, a Delaware limited liability company, and DOES 1 through 10, inclusive (collectively "Defendants"), as follows:

## I.   **PARTIES**

1.     Plaintiff Jasvir Kaur Dosanjh ("Plaintiff" or "Jas") is, and at all times herein mentioned was, an individual residing in Camberley, England.

2.     Defendant Dr. Romesh Wadhwani ("Wadhwani") is, and at all times herein mentioned was, an individual residing in Palo Alto, California.

3.     Defendant Harkamaljit Has Dosanjh ("Dosanjh") is, and at all times herein mentioned was, an individual residing in London, England.

4.     Defendant EYC Acquisition Corporation ("EYC Acquisition"), is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2475 Hanover Street, Palo Alto, County of Santa Clara, California 94304.

5.     Defendant Symphony Technology Group, LLC ("STG") is, and at all times herein mentioned was, a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 2475 Hanover Street, Palo Alto, County of Santa Clara, California 94304.

6.     Plaintiff is unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1 through 10, inclusive, and therefore sues these defendants, and each of them, by fictitious names. Plaintiff will seek leave of Court to amend her Complaint to allege the true names and capacities of the defendants named herein as DOES 1 through 10, inclusive, when those names and capacities have been ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of the fictitiously named defendants is liable and responsible in some manner for the claims, demands, losses, acts, and damages alleged herein.

7.     Plaintiff is informed and believes, and based thereon alleges, that in

1   conducting the acts alleged herein, each of the Defendants was acting for himself

2   or itself and was acting as the agent, employee, and/or representative of each of

3   the other defendants within the course and scope of such agency, employment,

4   and/or representation. Plaintiff is further informed and believe, and based thereon

5   alleges, that the acts and conduct of each of the Defendants as alleged herein were

6   known to, authorized, and ratified by each of the other defendants.

7       8.     Plaintiff is informed and believes, and based thereon alleges, that

8   each of the Defendants aided and abetted one another by providing substantial

9   encouragement and/or assistance in doing the acts alleged herein, with knowledge

10  of the wrongful nature of the conduct and the harm to Plaintiff that would result

11  therefrom. There is, and was, a substantial causal connection between the conduct

12  of the aider and abettor and the harm to Plaintiff, and the encouragement and/or

13  assistance was a substantial factor in causing the resulting harm. As a result,

14  Defendants are not only liable for their direct torts and tortious conduct but are

15  secondarily liable to Plaintiff as a result of their aiding and abetting.

16      9.     Plaintiff is informed and believes, and based thereon alleges, that the

17  alter-ego doctrine and single-enterprise rule should apply because there exists, and

18  at all times herein mentioned there existed, a unity of interest and/or ownership of

19  and between Defendants and DOES 1 through 10, inclusive, such that any

20  individuality and separateness of each Defendant has ceased.

21  **II.   <u>JURISDICTION AND VENUE</u>**

22      10.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332

23  based on diversity because Plaintiff and each Defendant are citizens of different

24  states and the amount in controversy exceeds the sum or value of $75,000.

25      11.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a

26  substantial part of the events or omissions giving rise to the claim occurred in this

27  judicial district.

28      12.    Venue is also proper pursuant to 28 U.S.C. § 1391(c) because

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   Defendant Wadhwani resides in this judicial district and Defendant EYC
2   Acquisition has or had its principal places of business in this judicial district.

3         13.    This Court has personal jurisdiction over each Defendant because
4   each Defendant purposefully directed its activities at the State of California,
5   specifically, (a) each Defendant either resides in, has its principal place of
6   business in, or is doing business continuously in the State of California and this
7   judicial district, (b) a substantial part of the wrongful acts committed by each
8   Defendant occurred in the State of California and this judicial district, and (c)
9   each Defendant knows that the damages and other harmful effects of its activities
10   occurred in the State of California and this judicial district.

11   **III.**    **FACTUAL ALLEGATIONS**

12         14.    Jas and Dosanjh are citizens of the United Kingdom. Jas and Dosanjh
13   were previously married, and their divorce was final in January 2011. Yet, the
14   parties continued to litigate certain issues before the court through 2020.

15         15.    In or about October 2003, during their marriage, Jas and Dosanjh
16   started a company named EYC Limited ("EYC Limited").

17         16.    EYC Limited was a corporation organized and existing under the
18   laws of the United Kingdom with its principal place of business in Richmond,
19   England.

20         17.    At first, Jas and Dosanjh jointly owned the majority of the shares in
21   EYC Limited, and their business associate and Dosanjh's best friend held the
22   remaining minority interest.

23         18.    EYC's business consisted of collecting grocery store loyalty card
24   information and tracking the products consumers purchased. EYC's grocery store
25   clientele used this information to improve their marketing to their customers.

26         19.    In or about December 2004, EYC Limited signed a lucrative contract
27   with Safeway to provide the U.S.-based grocery store chain a new way to address
28   its customer needs.

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1

2

3

4

5

6

7

8

9

10

11

12

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20.     On or about July 25, 2005, Dosanjh incorporated a new company named EYC USA, Inc. ("EYC USA").  EYC USA was a Delaware corporation with its principal place of business in Pleasanton, California.

21.     According to documents filed by Dosanjh in the divorce proceeding: "EYC USA was established to provide administration for EYC's growing USA employee base."

22.     On or about July 6, 2005, Dosanjh formed a holding company in the United Kingdom named EYC Group Limited ("EYC Group").  EYC Group was a holding company for both EYC Limited and EYC USA.

23.     According to Dosanjh's court documents and corporate records for EYC Group, as of December 2006, Dosanjh owned a majority interest, Jas owned a minority interest, and Mr. Sheedy was removed as a shareholder.

24.     According to Dosanjh's Narrative, in or about August 2007, EYC USA opened an office in Pleasanton, California to better service its main client, a nationally recognized grocery store chain.

25.     In October 2008, Jas initiated divorce proceedings in England.

26.     Jas was represented by Payne Hicks Beach ("PHB"), a law firm based in London.

27.     Throughout the divorce proceedings, Dosanjh and his legal representatives falsely claimed EYC Group was not worth anything.

28.     Dosanjh falsely represented that EYC Group was "severely cash strapped," that "EYC is in the worst financial position it has ever faced," that "EYC is facing administration in December 2009," and that he and his senior team were trying to "move the company away from the verge of administration," which is the term for bankruptcy in England.

29.     Despite Dosanjh's claims that EYC Group was on the verge of bankruptcy, Dosanjh rejected at least seven multi-million dollar offers to sell EYC Group.

1   30.    For example, a multinational professional services company

2   headquartered in Dublin, Ireland, submitted two Letters of Intent between August

3   and November 2008 to purchase EYC Group for $35,000,000 to $40,000,000.

4   31.    Despite the fact Jas held a minority ownership in EYC Group,

5   Dosanjh cut Jas out of these negotiations.

6   32.    In or about January 2009, Dosanjh's business associate emailed him

7   and asked whether Dosanjh wanted to reject the offer at $35,000,000.00. The

8   email stated:  "Is it a 'no' at the current price or a 'no' at any price? Understand

9   there are other issues as well."

10   33.    Dosanjh responded by e-mail: "The other issues that make price

11   irrelevant."

12   34.    Dosanjh's response – that a purchase price of $35,000,000.00 was

13   "irrelevant" – underscores just how far he would go to prevent Jas from receiving

14   a single penny as EYC Limited's co-founder.

15   35.    Dosanjh emailed Jas on February 20, 2009: "I am going to fight hard

16   now for EVERYTHING. I'm going to save my kids from the manipulative

17   horrible mother that you are."

18   36.    In a subsequent voicemail on February 22, 2009, Dosanjh told Jas:

19   "I'm now gonna fight really hard, if my lawyers ain't gonna do it then I'm gonna

20   find ones that are yeah but you are just taking the piss now. . . I'm about to break

21   but not gonna break before I take you all the way to the cleaners . . . I've got

22   nothing to lose."

23   37.    In or about July 2009, Dosanjh started negotiations with Defendant

24   Wadhwani to sell EYC Group to Wadhwani's company, SymphonyIRI, a

25   competitor of EYC Group.

26   38.    According to Dosanjh's Affidavit filed in the divorce proceeding on

27   or about November 4, 2009, Dosanjh believed that "IRI through its parent

28   Symphony made contact with EYC when it discovered that it was going to lose

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

the Ahold business and it was apparent EYC could win.  The Chairman of

Symphony, Mr. Romesh Wadhwani, contacted me directly on July 27th 2009 to

discuss an opportunity."

39.     According to Dosanjh's Affidavit, on August 5, 2009, Dosanjh met

with Wadhwani and SymphonyIRI's Chief Executive Officer regarding the

potential sale for two days in August 2009, where he asked Wadhwani to "write

up his merger proposals."

40.     In an email dated August 8, 2009, Wadhwani emailed Dosanjh the

"Draft Agreement Framework with EYC" that "makes Symphony-IRI Group +

EYC the premier global provider of solutions and services for shopper

marketing/loyalty."

41.     In the same email on August 8, 2009, Wadhwani confirmed that

Dosanjh would receive shares of his company.

42.     In his email, Wadhwani provided "Example Outcomes" showing the

potential value of the sale to Dosanjh would be in the millions of dollars.

43.     The emails between Dosanjh and Wadhwani between August 8, 2009

and August 13, 2009 included their negotiations for Dosanjh to receive shares as

part of the sale.  In one email, Dosanjh states: "I want to contribute more and get

more stock."

44.     These negotiations between Dosanjh and Wadhwani regarding the

terms of the EYC sale to Symphony were not disclosed initially to Jas or PHB in

the divorce proceedings.

45.     Critically, in emails between September 6 and September 7, 2009,

Dosanjh and one of EYC Group's employees exchanged revisions and comments

to Wadhwani's "Letter of Intent for The Purchase of EYC by The Symphony IRI

Group." ("Letter of Intent").

46.     In the revisions, Dosanjh deleted his name as a key employee who

would receive IRI's stock and his post-acquisition role as Chairman of the new

company, SymphonyEYC Group, and as Executive Vice President of SIG.

47.     In revised comments, Dosanjh's future employment status was replaced with the following sentence: "The status of employment for Has Dosanjh shall be decided after the conclusion of personal matters."

48.     This incriminating document was not disclosed initially to Jas or PHB in the divorce proceedings.

49.     One month later, in or about October 2009, Jas sought an injunction from the UK court to prohibit Dosanjh from selling EYC Group to STG without including her in the negotiations.

50.     The UK Court granted the injunction and ordered Dosanjh and his attorneys to produce all documents relating to his negotiations with Wadhwani.

51.     The court also ordered Dosanjh and his lawyers to produce all documents relating to his negotiations with Wadhwani.

52.     On October 26, 2009, Jas's attorneys sent a letter to Wadhwani that enclosed the court's injunction order prohibiting the sale of EYC without including Jas in the negotiations.

53.     In a massive "data dump" to Jas's attorneys in response to the injunction, Dosanjh and his attorneys buried the incriminating emails and revisions to Wadhwani's Letter of Intent among thousands of documents.

54.     Dosanjh and Wadhwani continued to e-mail each other regarding a pitch for their new company "Symphony EYC" to one of EYC Group's most profitable clients.  Dosanjh also told Wadhwani that he had announced the future STG-EYC merger to at least three senior employees.

55.     Despite the UK Court's injunction, Jas was not included in any of these negotiations.

56.     In an email dated January 18, 2010, Wadhwani told Dosanjh: "I am twice as determined to succeed in the shopper analytics/shopper marketing/shopper relationship management/precision direct marketing space so

long as you are still committed to our partnership.  I am fully committed to the success of SymphonyEYC on a global basis, whatever it takes, with your support."

57.    As proof of his commitment, Wadhwani formed Defendant EYC Acquisition for the purpose of purchasing EYC Group.

58.    Although Dosanjh knew Wadhwani was fully committed to purchasing EYC Group, Dosanjh provided false and misleading updates to Jas and PHB that EYC was on the verge of bankruptcy.

59.    Specifically, in an email to Jas and her lawyers dated August 25, 2010, Dosanjh expressed doubt as to "EYC's ability to survive the future" and stated: "For me, as I have pointed out to you on many occasions, I need to get a second job to support my basic needs."

60.    Between November 2009 and February 2010, Dosanjh falsely represented by e-mail to Jas and her attorneys that Wadhwani's offer to give bonus shares to Dosanjh, as reflected in their negotiations between August and September 2009, was no longer on the table.

61.    Wadhwani also made false representations to Jas regarding the value of EYC Group and the deal terms.  On or about February 4, 2010, Jas met with Wadhwani in person, during which Wadhwani told Jas that he had no idea she co-founded EYC Group, and that he would ensure the deal terms were fair to her. Wadhwani also falsely promised Jas that there would be truth and transparency in STG's acquisition of EYC Group, and that any questions Jas and her lawyers had regarding Dosanjh's salary, bonus, shares, would be answered truthfully.

62.    On or about September 24, 2010, Jas received a telephone call from Wadhwani, during which Wadhwani offered Jas trivial sum for her minority interest, plus legal fees. When Jas told him she thought her shares were worth more, Wadhwani told her EYC Group was not worth anything of value and there were other companies better than EYC Group.  When Jas asked him why he had

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   been trying to purchase EYC Group for more than one year if it was not valuable,

2   Wadhwani mumbled something about changing market values.

3         63.    On or about September 29, 2010, Jas received another telephone call

4   from Wadhwani, during which Wadhwani again represented to Jas that EYC

5   Group was not worth anything and that it would be in bankruptcy within days if

6   Jas continued to object to the sale.  Wadhwani asked Jas if she really wanted all of

7   EYC Group's employees to lose their jobs and homes because of her. Jas told

8   Wadhwani that she believed her minority interest was worth more than he was

9   offering, and she also wanted shares of the new company.  Wadhwani informed

10   her that he would have STG's Financial Director contact her the next day.

11         64.    On or about September 30, 2010, Dosanjh's lawyer emailed Jas's

12   lawyer and gave a "Final offer" for Jas to sell her minority interest in EYC Group

13   to STG.  The offer was only open until 12 p.m. the following day.

14         65.    The email stated the offer was based on information from Dosanjh

15   that "EYC remains loss-making" and "has not been able to meet its payroll

16   commitments this month (September)." The email also stated: "In the absence of a

17   deal being struck in very short order it is Symphony's understanding that EYC

18   Group Ltd. and EYC Limited will have no option but to file for administration or

19   liquidation in order to minimise losses to creditors.  Has Dosanjh has indicated

20   that such a filing could happen as early as Friday."

21         66.    On October 4, 2010, the UK Court entered an order authorizing the

22   negotiations of the sale of EYC Group to STG.

23         67.    On October 6, 2010, in reliance on the continuous and repeated

24   misrepresentations by Dosanjh and Wadhwani about the negligible value of EYC

25   Group and its impending bankruptcy, Jas believed she had no choice but to sell

26   her minority interest pursuant to her sale agreement.

27         68.    Pursuant to the agreement, Jas sold her minority interest in EYC

28   Group to Symphony-nominated purchaser, EYC Acquisition, for less than its

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1    market value.

2         69.    The agreement defines the "Purchaser's Group" to include EYC

3    Acquisition, STG, STG-II, and all of its subsidiaries.

4         70.    The same day, October 6, 2010, Dosanjh also executed a sale

5    agreement to sell his majority interest in EYC Group to EYC Acquisition, for next

6    to nothing.

7         71.    Dosanjh also executed a "Consultancy Agreement" with EYC

8    Limited in which he would receive a healthy salary per year.

9         72.    On or about October 8, 2010, STG made the formal announcement

10   that STG acquired EYC Group.

11        73.    In January 2011, the UK Court entered the final Order of Dissolution

12   between Jas and Dosanjh ("Divorce Order"). Among other things, Dosanjh was

13   ordered to pay Jas a monthly amount and included 15% of his bonus payments,

14   which was defined as: (1) cash bonus payments received by Dosanjh as a result of

15   any consultancy or employment contract; and (2) any cash received by Dosanjh as

16   a result of the sale of stock granted, by way of grant or option, as a result of any

17   consultancy or employment contract.

18        74.    Importantly, Dosanjh represented to the UK Court that he had

19   received no bonus payments, including no cash resulting from any sale of stock.

20        75.    The Divorce Order included a table that was prepared by one of

21   Dosanjh's employees and the court-appointed accountant, Mr. Walton Dodge,

22   who later admitted in documents filed with the UK Court that he had not verified

23   the information provided to him by Dosanjh or Dosanjh's employee.

24        76.    The table purported to show millions of dollars in losses for EYC's

25   year-end balance sheets.

26        77.    Despite Dosanjh's representations that EYC was losing money and

27   going into bankruptcy, the true fact was that EYC Group was extremely

28   profitable. Indeed, after its sale to STG, EYC Group continued to be profitable

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1    under the Symphony umbrella.

2        78.    On or about August 4, 2011, Dosanjh entered into a Consultancy

3    Agreement with EYC Ltd., based in the United Kingdom, and EYC, Inc., based in

4    the United States, which provided for the grant of stock options to Dosanjh.

5        79.    In or about December 2012, STG merged two companies to create

6    SymphonyEYC ("SymphonyEYC").

7        80.    In or about January 2013, STG formed a new company named

8    SymphonyEYC Cayman Limited ("Symphony Cayman"), which was organized

9    and existing under the laws of the Cayman Islands.

10       81.    On or about March 22, 2013, Dosanjh entered into an Employment

11   Agreement effective as of January 1, 2013 with SymphonyEYC, whereby

12   Dosanjh was employed as Executive Vice President with a substantial base salary.

13       82.    Dosanjh's Employment Agreement with SymphonyEYC also

14   provided him with stock options that were equal to 2.5% of all shares in

15   Symphony Cayman.  On information and belief, Dosanjh currently owns 5% of

16   stocks in Symphony Cayman.

17       83.    On or about June 3, 2014, Dosanjh's Employment Agreement with

18   SymphonyEYC was terminated.

19       84.    Despite the Divorce Order requiring Dosanjh to disclose to Jas and

20   her attorneys that he received stock, by way of grant or option, through his

21   consultancy and employment agreements, Dosanjh falsely represented to Jas and

22   her attorneys that he never received stock options from these agreements.

23       85.    In or about June 2018, Jas e-mailed Dosanjh asking him if he had

24   received stock in one of Wadhwani's companies when EYC was sold in 2010. In

25   response, Dosanjh remarked that he did receive stock as part of the sale.

26       86.    When Jas attempted to recover Dosanjh's e-mail, she discovered it

27   had been permanently deleted.  On information and belief, Dosanjh previously

28   gained unauthorized access to Jas's emails and had done so again to delete his

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   self-incriminating email.

2       87.    One month later, in July 2018, Jas re-opened the divorce case in the

3   UK in order to address Dosanjh's payments were in arrears. During this time, Jas

4   also investigated Dosanjh's statement to her that he received stock as part of the

5   EYC sale, which was not previously disclosed to Jas or her attorneys.

6       88.    Between July 2018 and May 2020, the UK Court held hearings that

7   ultimately concluded with Dosanjh denying that he ever received anything from

8   stocks and denying that he had ever received any shares.

9       89.    On or about May 29, 2020, the UK Court issued an amended Divorce

10  Order which, among other things, extinguished Dosanjh's obligation to pay Jas a

11  portion of his bonus payments, which included any cash received by Dosanjh

12  from the sale of stock granted to him in connection with his consultancy

13  agreements and employment contracts.

14      90.    In or about February 2020, Jas discovered an article dated June 1,

15  2011 regarding the announcement by IRI, which was SymphonyIRI at the time,

16  that New Mountain had completed its majority investment in the company.

17      91.    The article stated that, *as early as August 2010*, STG's management

18  team had invited New Mountain "to consider an investment in the company as a

19  long-term, strategic, private equity partner."

20      92.    The article also stated that New Mountain's investment made it the

21  majority shareholder in SymphonyIRI, while STG maintained a "significant"

22  equity position.

23      93.    Upon learning about the negotiations between New Mountain and

24  SymphonyIRI that occurred as early as August 2010, Jas believed the only way

25  Dosanjh would have sold his majority interest in EYC Group to STG for next to

26  nothing two months later was that there was a side deal for him to receive a

27  significant interest in Wadhwani's companies in connection with the sale.

28      94.    Importantly, Dosanjh rejected *at least seven previous offers* to sell

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   EYC Group for a much higher price.

2       95.    As he admitted by voicemail and text message to Jas, Dosanjh was

3   committed to making sure Jas would not receive any financial benefit from selling

4   her minority interest in EYC Group.

5       96.    In pursuit of this commitment, Dosanjh misrepresented the true value

6   of the company and sold his majority interest to STG, with the knowledge that he

7   would receive a substantial interest in Wadhwani's companies.

8       97.    Defendants concealed the material facts about SymphonyIRI's

9   negotiations with New Mountain so that Jas would execute an agreement to sell

10  her minority interest in EYC Group for less than its value.

11      98.    On information and belief, Defendants also concealed the material

12  fact that Wadhwani and Dosanjh agreed, as part of STG's acquisition of EYC

13  Group, Dosanjh would receive a substantial interest in Wadhwani's companies.

14  **FIRST CAUSE OF ACTION – FRAUDULENT INDUCEMENT**

15      99.    Plaintiff realleges and incorporates herein by reference each and

16  every prior allegation as though fully set forth herein.

17      100.   Defendants are liable for fraudulent inducement.

18      101.   Dosanjh made specific misrepresentations to Jas, through

19  communications by e-mail and in court filings, as follows:

20          a.     On or about August 17, 2009, Dosanjh filed his Narrative with

21  the UK Court, wherein he falsely represented that EYC Group was "severely cash

22  strapped," and that he and his senior team were trying to "move the company

23  away from the verge of administration," which is the term for bankruptcy in

24  England.

25          b.     On November 4, 2009, Dosanjh executed and filed his

26  Affidavit with the UK Court, wherein he falsely represented that "EYC is in the

27  worst financial position it has ever faced" and that "EYC is facing administration

28  in December 2009.  We have 6 weeks left."

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

c.      In an email to Jas dated August 25, 2010, Dosanjh falsely represented that EYC lost one of its most profitable clients when in fact, Dosanjh and Wadhwani were pitching the company with marketing materials branded "Symphony EYC."

d.      In the same email to Jas, Dosanjh falsely cast doubt on "EYC's ability to survive the future" and falsely represented that he needed "to get a second job to support my basic needs."

e.      Between November 2009 and February 2010, Dosanjh falsely represented by e-mail to Jas and her attorneys that Wadhwani's deal term to give bonus shares to Dosanjh, as reflected in their negotiations between August and September 2009, was no longer on the table.

f.      In or about October 2018 and August 18, 2019, Dosanjh falsely represented by e-mail to Jas and her attorneys that he never received stock or stock options from any of his consultancy or employment agreements.

102.   Wadhwani made specific misrepresentations to Jas, through communications by telephone and in-person meetings, as follows:

a.      On or about February 4, 2010, Jas had an in-person meeting with Wadhwani, during which Wadhwani told Jas that he had no idea that she co-founded EYC Group, and that he would ensure the deal was fair to her. Wadhwani promised Jas there would be truth and transparency in STG's acquisition of EYC Group, and that any questions Jas and her lawyers had regarding Dosanjh's salary, bonus, shares, would be answered truthfully.

b.      On or about September 24, 2010, Jas received a telephone call from Wadhwani, during which Wadhwani made an offer for her shares. When Jas told him she thought her shares were worth more, Wadhwani told her that EYC Group was not worth anything of value and there were other companies better than EYC Group.  When Jas asked him why he had been trying to purchase EYC Group for more than one year if it was not valuable, Wadhwani mumbled

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   something about changing market values.

2           c.      On or about September 29, 2010, Jas received another

3   telephone call from Wadhwani, during which Wadhwani again represented to Jas

4   that EYC Group was not worth anything and that it would be in bankruptcy within

5   days if Jas continued to object to the sale.  Wadhwani asked Jas if she really

6   wanted all of EYC Group's employees to lose their jobs and homes because of

7   her. Jas told Wadhwani that she believed her interest was worth more than he was

8   offering, and she also wanted shares of the new company.  Wadhwani informed

9   her that he would have STG's Financial Director contact her the next day. The

10  following day, instead of STG's Financial Director, Dosanjh's attorney emailed

11  Jas with the take-it-or-leave-it "Final Offer."

12          103.  Defendants made the foregoing misrepresentations to Jas with

13  knowledge of their falsity.

14          104.  By making the foregoing misrepresentations, Defendants intended to

15  defraud Jas and to induce reliance by Jas for the purpose of inducing Jas to sell

16  her minority interest.

17          105.  In reliance on Defendants' misrepresentations, Jas executed a sale

18  agreement, whereby she sold her minority interest in EYC to Symphony's EYC

19  Acquisition for an extremely low value compared to the actual value of her shares.

20          106.  Jas justifiably relied on the misrepresentations made by Dosanjh

21  because Dosanjh made them in the course of their divorce proceedings when he

22  was represented by lawyers who had an ethical duty to ensure their client

23  provided accurate information to Jas, her lawyers, and to the UK Court.

24          107.  Jas justifiably relied on the misrepresentations made by Wadhwani

25  because Wadhwani had years of experience in the retail industry, Wadhwani

26  presented himself to Jas as an expert in the business, Jas believed Wadhwani

27  knew things that she did not know about the valuation of a business like EYC

28  Group, and Wadhwani reassured Jas that he was honest and truthful, and that he

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

and his staff would answer truthfully the questions Jas and her lawyers had regarding Dosanjh's salary, bonus, and shares.

108. Had the true facts been known to Jas, she would not have executed an agreement to sell her shares.

109. As a result of her justifiable reliance on Defendants' misrepresentations, Jas incurred damages in an amount to be determined at trial, including, but not limited to, the actual value of her minority ownership interest in EYC Group at the time of acquisition.

110. Jas is informed and believes, and based thereon alleges, that in doing the acts described above, Defendants acted with oppression, fraud, and malice, as those terms are defined in California Civil Code Section 3294 and, therefore, Jas is entitled to an award of punitive damages in an appropriate amount to deter similar conduct in the future.

## SECOND CAUSE OF ACTION - FRAUD BY INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

111. Plaintiff realleges and incorporates herein by reference each and every prior allegation as though fully set forth herein.

112. Defendants are liable for fraud by intentional misrepresentation.

113. Dosanjh made specific misrepresentations to Jas, through communications by e-mail and by court filings, as follows:

a. On or about August 17, 2009, Dosanjh filed his Narrative with the UK Court, wherein he falsely represented that EYC Group was "severely cash strapped," and that he and his senior team were trying to "move the company away from the verge of administration," which is the term for bankruptcy in England.

b. On November 4, 2009, Dosanjh executed and filed his Affidavit with the UK Court, wherein he falsely represented that "EYC is in the

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

worst financial position it has ever faced" and that "EYC is facing administration in December 2009.  We have 6 weeks left."

       c.     In an email to Jas dated August 25, 2010, Dosanjh falsely represented that EYC lost its most profitable client when in fact, Dosanjh and Wadhwani were pitching the company with marketing materials branded "Symphony EYC."

       d.     In the same email, Dosanjh falsely cast doubt on "EYC's ability to survive the future" and falsely represented that he needed "to get a second job to support my basic needs."

       e.     Between November 2009 and February 2010, Dosanjh falsely represented by e-mail to Jas and her attorneys that Wadhwani's deal term to give bonus shares to Dosanjh, as reflected in their negotiations between August and September 2009, was no longer on the table.

       f.     In or about October 2018 and August 18, 2019, Dosanjh falsely represented by e-mail to Jas and her attorneys that he never received stock or stock options from any of his consultancy or employment agreements.

114.   Wadhwani made specific misrepresentations to Jas, through communications by telephone and in-person meetings, as follows:

       a.     On or about February 4, 2010, Jas had an in-person meeting with Wadhwani, during which Wadhwani told Jas that he had no idea that she co-founded EYC Group, and that he would ensure the deal was fair to her. Wadhwani promised Jas there would be truth and transparency in STG's acquisition of EYC Group, and that any questions Jas and her lawyers had regarding Dosanjh's salary, bonus, shares, would be answered truthfully.

       b.     On or about September 24, 2010, Jas received a telephone call from Wadhwani, during which Wadhwani made an offer to Jas for her shares. When Jas told him she thought her shares were worth more, Wadhwani told her that EYC Group was not worth anything of value and there were other companies

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

better than EYC Group.  When Jas asked him why he had been trying to purchase EYC Group for more than one year if it was not valuable, Wadhwani mumbled something about changing market values.

c.      On or about September 29, 2010, Jas received another telephone call from Wadhwani, during which Wadhwani again represented to Jas that EYC Group was not worth anything and that it would be in bankruptcy within days if Jas continued to object to the sale.  Wadhwani asked Jas if she really wanted all of EYC Group's employees to lose their jobs and homes because of her. Jas told Wadhwani that she believed her interest was worth more than he was offering, and she also wanted shares of the new company.  Wadhwani informed her that he would have STG's Financial Director contact her the next day. The following day, instead of STG's Financial Director, Dosanjh's attorney emailed Jas with the take-it-or-leave-it "Final Offer."

115.   Defendants made the foregoing misrepresentations to Jas with knowledge of their falsity.

116.   By making the foregoing misrepresentations, Defendants intended to defraud Jas and to induce reliance by Jas for the purpose of inducing Jas to sell her minority interest.

117.   In reliance on Defendants' misrepresentations, Jas executed a sale agreement, whereby she sold her minority interest in EYC to Symphony's EYC Acquisition for an extremely low value compared to the actual value of her shares.

118.   Jas justifiably relied on the misrepresentations made by Dosanjh because Dosanjh made them in the course of their divorce proceedings when he was represented by lawyers who had an ethical duty to ensure their client provided accurate information to Jas, her lawyers, and to the UK Court.

119.   Jas justifiably relied on the misrepresentations made by Wadhwani because Wadhwani had years of experience in the retail industry, Wadhwani presented himself to Jas as an expert in the business, Jas believed Wadhwani

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   knew things that she did not know about the valuation of a business like EYC

2   Group, and Wadhwani reassured Jas that he was honest and truthful, and that he

3   and his staff would answer truthfully the questions Jas and her lawyers had

4   regarding Dosanjh's salary, bonus, and shares.

5        120.   As a result of her justifiable reliance on Defendants'

6   misrepresentations, Jas incurred damages in an amount to be determined at trial,

7   including, but not limited to, the actual value of her minority ownership interest in

8   EYC Group at the time of acquisition.

9        121.   Jas is informed and believes, and based thereon alleges, that in doing

10  the acts described above, Defendants acted with oppression, fraud, and malice, as

11  those terms are defined in California Civil Code Section 3294 and, therefore, Jas

12  is entitled to an award of punitive damages in an appropriate amount to deter

13  similar conduct in the future.

14        **<u>THIRD CAUSE OF ACTION – FRAUD BY CONCEALMENT</u>**

15                    **(Against All Defendants)**

16        122.   Plaintiff realleges and incorporates herein by reference each and

17  every prior allegation as though fully set forth herein.

18        123.   Defendants are liable for fraud by concealment.

19        124.   Defendants concealed the following material facts from Jas:

20             a.      Defendants concealed the material fact that New Mountain and

21  SymphonyIRI were negotiating New Mountain's substantial investment into

22  SymphonyIRI as early as August 2010.

23             b.      On information and belief, Defendants concealed the material

24  fact that as part of STG's acquisition of EYC Group, Dosanjh received shares in

25  one of Wadhwani's companies.

26        125.   Defendants had a duty to disclose these material facts.

27        126.   Defendants intended to defraud Jas by intentionally concealing these

28  material facts.

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

127.   Jas was unaware of these material facts until February 2020, when she discovered the article stating that New Mountain announced that it had completed its majority investment in SymphonyIRI after engaging in negotiations beginning in August 2010.

128.   Had Jas known about these material facts that were concealed from her, she would not have executed the sale agreement.

129.   As a result of Defendants' concealment of these material facts, Jas has incurred damages in an amount to be determined at trial, including, but not limited to, the actual value of her minority ownership interest in EYC Group at the time of EYC Group's acquisition by STG.

130.   Jas is informed and believes, and based thereon alleges, that in doing the acts described above, Defendants acted with oppression, fraud, and malice, as those terms are defined in California Civil Code Section 3294 and, therefore, Jas is entitled to an award of punitive damages in an appropriate amount to deter similar conduct in the future.

## FOURTH CAUSE OF ACTION – NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

131.   Plaintiff realleges and incorporates herein by reference each and every prior allegation as though fully set forth herein.

132.   Defendants are liable for fraud by intentional misrepresentation.

133.   Dosanjh made specific misrepresentations to Jas, through communications by e-mail and in court filings, as follows:

a.   On or about August 17, 2009, Dosanjh filed his Narrative with the UK Court, wherein he falsely represented that EYC Group was "severely cash strapped," and that he and his senior team were trying to "move the company away from the verge of administration," which is the term for bankruptcy in England.

b.   On November 4, 2009, Dosanjh executed and filed his

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

1   Affidavit with the UK Court, wherein he falsely represented that "EYC is in the

2   worst financial position it has ever faced" and that "EYC is facing administration

3   in December 2009.  We have 6 weeks left."

4           c.      In an email to Jas dated August 25, 2010, Dosanjh falsely

5   represented that EYC lost its most profitable client, when in fact, Dosanjh and

6   Wadhwani were pitching the company with marketing materials branded

7   "Symphony EYC."

8           d.      In the same email, Dosanjh falsely cast doubt on "EYC's

9   ability to survive the future" and falsely represented that he needed "to get a

10  second job to support my basic needs."

11          e.      Between November 2009 and February 2010, Dosanjh falsely

12  represented by e-mail to Jas and her attorneys that Wadhwani's deal term to give

13  bonus shares to Dosanjh, as reflected in their negotiations between August and

14  September 2009, was no longer on the table.

15          f.      In or about October 2018 and August 18, 2019, Dosanjh

16  falsely represented by e-mail to Jas and her attorneys that he never received stock

17  or stock options from any of his consultancy or employment agreements.

18      134.   Wadhwani made specific misrepresentations to Jas, through

19  communications by telephone and in-person meetings, as follows:

20          a.      On or about February 4, 2010, Jas had an in-person meeting

21  with Wadhwani, during which Wadhwani told Jas that he had no idea that she co-

22  founded EYC Group, and that he would ensure the deal was fair to her. Wadhwani

23  promised Jas there would be truth and transparency in STG's acquisition of EYC

24  Group, and that any questions Jas and her lawyers had regarding Dosanjh's salary,

25  bonus, shares, would be answered truthfully.

26          b.      On or about September 24, 2010, Jas received a telephone call

27  from Wadhwani, during which Wadhwani made an offer to Jas for her shares.

28  When Jas told him she thought her shares were worth more, Wadhwani told her

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

that EYC Group was not worth anything of value and there were other companies better than EYC Group.  When Jas asked him why he had been trying to purchase EYC Group for more than one year if it was not valuable, Wadhwani mumbled something about changing market values.

        c.      On or about September 29, 2010, Jas received another telephone call from Wadhwani, during which Wadhwani again represented to Jas that EYC Group was not worth anything and that it would be in bankruptcy within days if Jas continued to object to the sale.  Wadhwani asked Jas if she really wanted all of EYC Group's employees to lose their jobs and homes because of her. Jas told Wadhwani that she believed her interest was worth more than he was offering, and she also wanted shares of the new company.  Wadhwani informed her that he would have STG's Financial Director contact her the next day. The following day, instead of STG's Financial Director, Dosanjh's attorney emailed Jas with the take-it-or-leave-it "Final Offer."

135.   Defendants knew, or should have known, that the foregoing misrepresentations were false.

136.   In reliance on Defendants' misrepresentations, Jas executed the sale agreement, whereby she sold her minority interest in EYC to Symphony's EYC Acquisition for an extremely low value compared to the actual value of her shares.

137.   Jas justifiably relied on the misrepresentations made by Dosanjh because Dosanjh made them in the course of their divorce proceedings when he was represented by lawyers who had an ethical duty to ensure their client provided accurate information to Jas, her lawyers, and to the UK Court.

138.   Jas justifiably relied on the misrepresentations made by Wadhwani because Wadhwani had years of experience in the retail industry, Wadhwani presented himself to Jas as an expert in the business, Jas believed Wadhwani knew things that she did not know about the valuation of a business like EYC Group, and Wadhwani reassured Jas that he was honest and truthful, and that he

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

and his staff would answer truthfully the questions Jas and her lawyers had regarding Dosanjh's salary, bonus, and shares.

139.   As a result of her justifiable reliance on Defendants' misrepresentations, Jas incurred damages in an amount to be determined at trial, including, but not limited to, the actual value of her minority ownership interest in EYC at the time of acquisition.

140.   Jas is informed and believes, and based thereon alleges, that in doing the acts described above, Defendants acted with oppression, fraud, and malice, as those terms are defined in California Civil Code Section 3294 and, therefore, Jas is entitled to an award of punitive damages in an appropriate amount to deter similar conduct in the future.

## FIFTH CAUSE OF ACTION – CIVIL CONSPIRACY
### (Against All Defendants)

141.   Plaintiff realleges and incorporates herein by reference each and every prior allegation as though fully set forth herein.

142.   All of the Defendants together formed a conspiracy to commit the unlawful and fraudulent conduct as described herein.

143.   On information and belief, there was an agreement between and among Defendants to commit the unlawful and fraudulent acts and to cooperate in furtherance of the commission of those unlawful and fraudulent acts. Their agreement is implied by the conduct of each Defendant because they shared common knowledge that their conduct was illegal and fraudulent and because of the nature and structure of their closely-connected companies and employment arrangements.

144.   On information and belief, Defendants were aware of the conduct of each other and of its unlawful nature, and Defendants agreed with each other that this conduct would be committed and intended that it be committed.

145.   It was in the interests of each Defendants to commit the unlawful and

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557

fraudulent acts described herein because they were financially motivated to induce Jas to sell her shares in EYC Group at an extremely low value so that STG Technology could acquire EYC Group.  Defendants acted in furtherance of their own financial gain.

146.   Plaintiff reasonably relied on Defendant's misrepresentations, and Defendant's representations were material to the decision of Plaintiff to sell her EYC Group's interest.

147.   As a direct and proximate result of Defendants' unlawful and fraudulent conduct, Plaintiff has suffered injury in fact and lost money in an amount to be determined at trial, including, but not limited to, the actual value of her minority ownership interest in EYC at the time of acquisition.

148.   Each of the Defendants is jointly and severally liable for the conduct committed by the conspiracy.

## PRAYER

Plaintiff prays for judgment against all of the Defendants in each of the causes of action as follows:

1.   For compensatory damages according to proof.

2.   For general and special damages according to proof.

3.   For punitive damages.

4.   For attorney's fees and costs.

5.   For such other and further relief as the Court deems just and proper.

Dated:  March 5, 2021                REVOLVE LAW GROUP LLP

By:   _____
Kimberly A. Wright
Attorneys for Plaintiff

1

## **DEMAND FOR JURY TRIAL**

2

3       Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all

4    issues so triable.

5

6    Dated:  March 5, 2021                    **REVOLVE LAW GROUP LLP**

7

8                                          .

9                          By:   _____

                                    Kimberly A. Wright
10                                  Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REVOLVE LAW GROUP
LLP
1200 Main Street, Suite 1200
Irvine, California 92614
(833) 775-4557